# CENTRAL RAILROAD COMPANY OF NEW JERSEY *v.* JERSEY CITY.

ERROR TO THE COURT OF ERRORS AND APPEALS OF THE STATE OF NEW JERSEY.

No. 203.   Argued April 15, 16, 1908.—Decided April 27, 1908.

"Jurisdiction" as generally used in compacts between States has a more limited sense than "sovereignty."

Under the agreement of 1833 between the States of New York and New Jersey, 4 Stats. 708, while exclusive jurisdiction is given to New York over the waters of the Hudson River west of the boundary line fixed by the agreement, the land under such waters remained subject to the sovereignty of New Jersey and the jurisdiction given to New York over the waters does not exclude the sovereign power of New Jersey to tax such land,—nor does an exercise of that power deprive the owner of the land of his property without due process of law.

This court in construing a compact between States will hesitate to reach a conclusion different from that reached by the highest courts of both States.

43 Vroom, 311, affirmed.

THE facts are stated in the opinion.

*Mr. Frank Bergen* and *Mr. William D. Edwards,* with whom *Mr. George Holmes* was on the brief, for plaintiff in error:

Prior to the execution of the compact New Jersey did not have jurisdiction for any purpose over the land under the waters of Hudson River and New York Bay and has no jurisdiction now below low-water mark of the river and bay or over the property of the plaintiff in error except that conferred by the compact. *Corfield* v. *Coryell,* 4 Wash. C. C. R. 371, cited and approved in *State* v. *Davis,* 25 N. J. Law, 387; *Handley's Lessee* v. *Anthony,* 5 Wheat. 374; *Shively* v. *Bowlby,* 152 U. S. 1, 13; *Martin* v. *Waddell,* 16 Pet. 345; *Henderson Bridge Co.* v. *Henderson City,* 173 U. S. 592.

By the compact exclusive jurisdiction was granted or conceded to New York over the land of the plaintiff in error, sub-

ject only to the right of New Jersey to regulate fisheries in the waters covering the same, provided navigation be not obstructed. It is admitted that if any docks, wharves or improvements had been made on the property they would be subject to taxation by New Jersey and (in this instance) as part of the upland. There are, however, no improvements on the property. *State* v. *Babcock*, 1 Vroom, 29; *Kiernan* v. *The Norma*, 32 Fed. Rep. 411; *Ferguson* v. *Ross*, 126 N. Y. 459.

Authority to regulate fisheries in the waters covering the property of the plaintiff in error does not involve the power to tax it.

The word "jurisdiction" is used in the compact in its broad common sense; that is, the power to govern—to exercise executive, legislative and judicial authority. We think the word was not used for the limited purpose of conferring merely judicial authority or the right to exercise partial or indefinite police power. The term "exclusive jurisdiction" is repeatedly used, and whenever qualified the exceptions are specified as definitely as possible. *United States* v. *Cornell*, 2 Mason, 60, 64, 91; *Loughborough* v. *Blake*, 5 Wheat. 317.

Taxation cannot be imposed except by authority of a government having jurisdiction over the property assessed broad enough to include the power to tax. *Louisville & Jeffersonville Ferry Co.* v. *Kentucky*, 188 U. S. 385, 396; *Union Transit Co.* v. *Kentucky*, 199 U. S. 194; *D., L. & W. R. R. Co.* v. *Pennsylvania*, 198 U. S. 341; Ops. Mass. Justices, 1 Metc. 580; *United States* v. *Ames*, 1 Woodbridge & Minot, 76, 80; *Mitchell* v. *Tibbets*, 17 Pick. 298, and *United States* v. *Rice*, 4 Wheat. 246.

New Jersey does not possess the power to tax the property of the plaintiff in error. That State has no jurisdiction below the low-water mark on its shore over Hudson River and New York Bay south of Spuyten Duyvil creek except over wharves, docks and improvements made and to be made thereon and over vessels aground thereon or fastened to any dock or wharf and the right to regulate fisheries; but even this measure of

jurisdiction is diminished by the provision that such vessels shall be subject to the quarantine or health laws and laws in relation to passengers of the State of New York, and the right to regulate fisheries cannot be exercised so as to hinder or obstruct navigation.

*Mr. Warren Dixon* for defendants in error:

It is the settled law of the State of New Jersey that lands under water within the state limits originally belonged to the State, and that title by holders other than the State is acquired from the State. The title to lands under water within the present limits of the State were vested in the King of Great Britain at and before the Revolution of 1776, and became vested by the law of nations and by the right of conquest in the people of the then Colony and now State of New Jersey by the War of Independence. *Martin* v. *Waddell,* 17 Peters, 367; *Arnold* v. *Munday,* 1 Halstead, 1; *Stevens* v. *Railroad Co.,* 5 Vroom, 540; *McCready* v. *Virginia,* 94 U. S. 391.

The State of New Jersey was seized in fee simple absolute in the soil covered by the waters of the Hudson River; and the said lands, being within the boundaries of the said State, were subject only to the paramount easement of navigation and to the power of regulating such easement possessed by the United States.

The State of New Jersey has always claimed ownership of the lands under water out to the middle of the Hudson River and the Bay of New York.

By the law of nations where an arm of the sea or a river is the boundary between two nations or states, if the original right of jurisdiction is in neither, in the absence of any convention respecting it, each holds to the middle of the stream. Angell on Tide-waters, p. 7; Vattel, B. 1, c. 22, § 266; Marten, B. 4, c. 3, 4, 5.

Article 4 of the compact between the States of New York and New Jersey, as construed by the courts, gives to New York merely the power of executing its quarantine law and laws re-

lating to passengers as to vessels passing over the waters of the Hudson River, and by necessary implication reserves to New Jersey every other political or governmental jurisdiction and dominion, and all prerogative, proprietary, and sovereign rights in and over the waters of the Hudson River and the lands lying thereunder and with the boundary fixed by the agreement. *People* v. *Central R. R. Co. of N. J.*, 42 N. Y. 283.

The action of the State of New Jersey in respect to its lands lying under its navigable waters within its boundaries, through various statutes passed by the legislature, constitutes a continued exercise and assertion of its ownership. (See "An act for preserving oysters in the Province of New Jersey," passed in the fifth year of George I, Nevill's Laws, p. 86; "An act for the preservation of oysters," passed January 26, 1789; "An act for the preservation of clams and oysters," passed June 9, 1820, p. 758; act of April 14, 1846, Rev. of 1847, p. 492, Rev. of 1877, p. 138; the wharf act, passed March 18, 1851, Rev. of 1877, p. 1240; the various riparian statutes, Gen. Stat. p. 2785.)

Lands under water formerly belonging to the State and granted by the State to property owners are subject to taxation. *Morris Canal Co.* v. *Jersey City*, 6 Vroom, 178; *State* v. *Pratt*, 4 Zab. 108; *State* v. *Sippl*, 1 Dutcher, 530; and see also 14 Vroom, 121; 17 Vroom, 341.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a writ of error prosecuted to review a judgment sustaining taxes levied by Jersey City upon lands of the plaintiff in error lying between the middle of New York Bay and its low water line on the New Jersey shore. It is argued that this land, although it belonged to New Jersey until conveyed, is not within its jurisdiction, and cannot be taxed under the authority of that State. The Supreme Court upheld the tax, 41 Vroom, 81, and its judgment was affirmed by the Court of Errors and Appeals for the reasons given by the Supreme Court. 43 Vroom, 311.

The plaintiff in error contended that, as New Jersey had not the right to tax, the attempt was to deprive the prosecutor of its property contrary to the Fourteenth Amendment, and brought the case here.

The decision depends upon the construction of an agreement made between New Jersey and New York for the purpose of settling the territorial limits and jurisdiction of the two States, which previously had been the subject of dispute. This agreement was made by commissioners appointed for the purpose, was confirmed by New York on February 5, 1834, Laws of 1834, ch. 8, p. 8, and by New Jersey on February 26, 1834, Laws of 1834, p. 118, and was approved by Congress by act of June 28, 1834, c. 126. 4 Stat. 708. By Article I, the boundary line between the two States from a point above the land in dispute is to be the middle of the Hudson River, of the Bay of New York, of the water between Staten Island and New Jersey, etc., "except as hereinafter otherwise particularly mentioned." By Article II, New York retains its present jurisdiction over Bedlow's and Ellis Islands, and exclusive jurisdiction over certain other islands in the waters mentioned. By Article III, New York is to have "exclusive jurisdiction of and over all the waters of the Bay of New York, and of and over all the waters of the Hudson River lying west of Manhattan Island and to the south" of the above mentioned point, "and of and over the land covered by the said waters to the low water mark on the westerly or New Jersey side thereof, subject to the following rights of property and jurisdiction of the State of New Jersey, that is to say: 1. The State of New Jersey shall have the exclusive right of property in and to the land under water lying west of the middle of the Bay of New York and west of the middle of that part of the Hudson River which lies between Manhattan Island and New Jersey." 2. New Jersey is to have exclusive jurisdiction over wharves, docks and improvements made or to be made on its shore and over vessels aground or fastened there, subject to the quarantine and passenger laws of New York. 3. New Jersey is to have the exclusive right of

regulating the fisheries on the west of the middle of said waters, providing that navigation be not obstructed or hindered.

The other articles need but brief mention. Article IV gives New York "exclusive jurisdiction" over the waters of the Kill van Kull "in respect to such quarantine laws and laws relating to passengers &c. and for executing the same," and over certain other waters. Article V gives New Jersey exclusive jurisdiction over certain other waters subject to New York's exclusive property and exclusive jurisdiction over wharves, docks and improvements within certain limits, and exclusive right of regulating the fisheries on its side, as above in the case of New Jersey. Articles VI and VII provide for the service of criminal and civil process of each State on the waters within the exclusive jurisdiction of the other. Article VIII and last calls for the confirmation of the agreement by the two States and approval by the Congress of the United States.

Thus the land which has been taxed is on the New Jersey side of the boundary line but under the "exclusive jurisdiction" of New York, subject to the exclusive right of property in New Jersey and the limited jurisdiction and authority conferred by the paragraphs summed up. The question is which of these provisions governs the right to tax. It appears to us plain on the face of the agreement that the dominant fact is the establishment of the boundary line. The boundary line is the line of sovereignty, and the establishment of it is not satisfied but is contradicted by the suggestion that the agreement simply gives the ownership of the land under water on the New Jersey side to that State as a private owner of land lying within the State of New York. On the contrary, the provision as to exclusive right of property in the compact between States is to be taken primarily to refer to ultimate sovereign rights, in pursuance of the settlement of the territorial limits, which was declared to be one purpose of the agreement, and is not to be confined to the assertion and recognition of a private claim, which, for all that appears, may have been inconsistent with titles already accrued and which would lose significance the

moment that New Jersey sold the land.  We repeat that boundary means sovereignty, since in modern times sovereignty is mainly territorial, unless a different meaning clearly appears. ·

It is said that a different meaning does appear in the Article (III) that gives New York exclusive jurisdiction over this land as well as the water above it.  But we agree with the state courts that have been called on to construe that part of  the agreement that the purpose was to promote the interests of commerce and navigation, not to take back the sovereignty that otherwise was the consequence of Article I.  This is the view of the New York as well as of the New Jersey Court of Errors and Appeals, and it would be a strange result if this court should be driven to a different conclusion from that reached by both the parties concerned.  *Ferguson* v. *Ross,* 126 N. Y. 459, 463; *People* v. *Central R. R. Co.,* 42 N. Y. 283.  This opinion is confirmed by the judgment delivered by one of the commissioners in *State* v. *Babcock,* 1 Vroom, 29.  Again, as was pointed out by the state court, the often expressed purpose of the appointment of the commissioner and of the agreement to settle the territorial limits and jurisdiction must mean by territorial limits sovereignty, and by jurisdiction something less.  It is suggested that jurisdiction is used in a broader sense in the second article, and that may be true so far as concerns Bedlow's and Ellis Islands.  But the provision there is that New York shall retain its "present" jurisdiction over them, and would seem on its face simply to be intended to preserve the *status quo ante,* whatever it may be.

Throughout nearly all the articles of the agreement, other than those in controversy, the word jurisdiction obviously is used in a more limited sense.  The word has occurred in other cases where a river was a boundary, and in the Virginia Compact was held to mean, primarily at least, *Jurisdictio,* authority to apply the law to the acts of men.  *Wedding* v. *Meyler,* 192 U. S. 573, 584.  Whether in the case at bar some power of police regulation also was conferred upon New York, as held in *Ferguson* v. *Ross,* need not be decided now.  That New Jersey

retained the sovereignty, however, seems to be assumed in Article III (2), giving her exclusive jurisdiction over wharves, docks and improvements, made and "to be made," on the shore. This does not grant the right to make such improvements, but assumes it to exist. But the right would need the permission of New York, except on the hypothesis that New Jersey had sovereign power over the place.

The conclusion reached has the very powerful sanction of the conduct of the parties and of the existing condition of things. See *Moore* v. *McGuire*, 205 U. S. 214, 220. The decisions of the courts have been referred to. It was admitted at the bar that the record of transfers of such lands was kept in New Jersey, not in New York. New York never has attempted to tax the land, while New Jersey has levied more or less similar taxes for many years without dispute. See, *e. g. State* v. *Collector of Jersey City*, 4 Zabr. 108, 120; *State* v. *Jersey City*, 1 Dutcher, 530; *State* v. *Jersey City*, 6 Vroom, 178; *S. C.*, 7 Vroom, 471. New Jersey, not New York, regulates the improvements on the shore. Act of March 18, 1851, P. L. 1851, p. 335; Rev. 1877, p. 1240; Act of April 11, 1864, P. L. 1864, p. 681; March 31, 1869, P. L. 1869, p. 1017; 3 Gen. Stat. 2784, 2786; *New York, Lake Erie & Western R. R. Co.* v. *Hughes*, 46 N. J. 67. Without going into all the details that have been mentioned in the careful and satisfactory discussion of the question in the state courts we are of opinion that the land in question is subject to the sovereignty of the State of New Jersey, and that the exclusive jurisdiction given to the State of New York does not exclude the right of the sovereign power to tax.

*Judgment affirmed.*